Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| STEFANIE BARRETT and RICHARD CHAPMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MAZDA MOTOR OF AMERICA, INC. d/b/a MAZDA NORTH AMERICAN OPERATIONS,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>JURY TRIAL DEMANDED<br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF** |

Plaintiffs Stefanie Barrett and Richard Chapman ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, allege upon personal knowledge as to themselves and upon information and belief as to all other matters, including investigation by counsel, as follows:

## NATURE OF THE ACTION

1. This is a class action lawsuit brought against Defendant Mazda Motor of America, Inc. d/b/a Mazda North American Operations ("Mazda" or "Defendant") by Plaintiffs, individually and on behalf of similarly situated consumers who purchased or leased the following vehicle models (herein referred to as the "Vehicles")[1] equipped with Mazda Connected Services:

- Mazda3 model years 2019-2025;
- CX-30 model years 2020-2025;
- CX-5 model years 2021-2025;
- CX-50 model years 2023-2025;
- CX-70 model year 2025;
- CX-90 model years 2024-2025; and
- MX-5 model years 2024-2025.

2. In recent years, connected vehicle technology has become an increasingly important factor in consumer vehicle purchasing decisions. Automotive manufacturers, including Mazda, market app-based connectivity and remote access functionality as premium convenience, safety, and ownership features designed to enhance the utility, value, and overall ownership experience associated with modern vehicles.

3. In November 2019, Mazda introduced "Mazda Connected Services" in the United States in connection with the launch of the 2020 Mazda CX-30.[2] Mazda marketed Connected Services as a standard feature on all CX-30 models in an effort "[t]o deepen the bond of the Mazda ownership experience."

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models and model years after conducting discovery.

[2] *See* Press Release, Mazda N. Am. Operations, *2020 Mazda CX-30: Inspiring the Road Ahead* (Nov. 20, 2019), https://news.mazdausa.com/2019-11-20-2020-Mazda-CX-30-Inspiring-The-Road-Ahead.

4. Mazda described Connected Services as a platform that would allow owners to remotely interact with, monitor, and manage their Vehicles through the MyMazda app. Mazda explained that Connected Services would provide owners with access to features including remote engine start, remote lock and unlock, vehicle finder, vehicle health monitoring, maintenance alerts, notifications, and emergency-related services.[3]

5. Mazda subsequently expanded Connected Services across additional models within its lineup.[4] Mazda continued to market Connected Services as an integrated and valuable component of the Mazda ownership experience, representing that Connected Services would provide "the unparalleled convenience of staying connected with the car through technology," including app-based access to remote vehicle functionality.

6. These are not trivial or ancillary features. Remote access functionality—including the ability to remotely start a vehicle, lock or unlock doors, locate a vehicle, monitor vehicle status, and receive maintenance or safety-related alerts—provides real-world utility and convenience to consumers and materially contributes to the value proposition associated with a connected vehicle.

7. Reasonable consumers evaluating Mazda vehicles equipped with these connected capabilities would consider the continued availability of such functionality material to their purchasing decisions, including whether to purchase a Mazda vehicle at all, which model or trim to select, and whether the vehicle offered sufficient value relative to competing alternatives.

8. Mazda's marketing consistently emphasized the convenience, accessibility, and utility of Connected Services functionality as part of the ownership experience associated with Mazda vehicles.

9. These prominently marketed features include remote engine start, remote door lock and unlock capability, vehicle finder functionality, vehicle monitoring,

---

[3] *See id.*

[4] Press Release, Mazda N. Am. Operations, *2021 Mazda3: Well-Suited with Added Powertrains* (July 8, 2020), https://news.mazdausa.com/2020-07-08-2021-mazda3-well-suited-with-added-powertrains.

maintenance notifications, and other app-based connected convenience functionality that materially influence consumers' purchasing decisions. Consumers reasonably understand these features to be part of the value of the Vehicles Mazda sells.

10. Instead, after consumers purchase compatible Mazda Vehicles, download the MyMazda App, and activate Connected Services, Mazda requires recurring subscription payments to maintain continued access to certain of those same prominently marketed features. Consumers who pay incur ongoing out-of-pocket losses. Consumers who do not pay lose access to functionality they reasonably understood to be part of the ownership experience associated with their vehicles.

11. Mazda knew, or at minimum should have known, that the requirement to pay recurring post-purchase subscription fees to retain continued access to prominently marketed vehicle functionality would be material to reasonable consumers. Yet Mazda failed to clearly and conspicuously disclose the true nature, duration, and limitations of its subscription-based Connected Service at or before the point of sale.

12. As a direct and proximate result of Mazda's misconduct, Plaintiffs and Class members paid more for their Vehicles than they otherwise would have, lost the benefit of their bargain, and suffered ascertainable economic injury.

13. Plaintiffs bring this action individually and on behalf of the classes defined below for common law fraud and fraudulent concealment, violations of California's Unfair Competition Law, the New Jersey Consumer Fraud Act, the Texas Deceptive Trade Practices Consumer Protection Act, and unjust enrichment.

## **JURISDICTION AND VENUE**

14. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

15. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

16. Venue is proper in this District under 28 U.S.C. § 1391 because Mazda's principal place of business is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### Plaintiffs

17. Plaintiff Stefanie Barrett is a citizen of the State of New Jersey and resides in Monmouth County, New Jersey. In or around 2021, Plaintiff Barrett leased a new 2021 Mazda CX-5 Vehicle from an authorized Mazda dealership in New Jersey. Plaintiff Barrett's Vehicle included access to Mazda Connected Services through the MyMazda App, including features such as remote start, remote lock and unlock, vehicle finder, and other app-based functionalities that Plaintiff Barrett used and valued as part of owning her Vehicle. Those features formed part of the value of the Vehicle and were material to Plaintiff Barrett's purchasing decision.

18. At the time Plaintiff Barrett purchased her Vehicle, neither Mazda nor the dealership clearly disclosed at or before the point of sale that continued access to those features would later be restricted or subject to future monthly charges after a limited period. Plaintiff Barrett first learned, in approximately 2025, that Mazda had placed some or all Connected Services features and remote functionalities behind a paid subscription requirement. Following expiration of the complimentary trial period, Plaintiff Barrett did not purchase a subscription. As a result, Plaintiff Barrett lost access to functionality she reasonably believed was included with her Vehicle as purchased, diminishing the Vehicle's utility, convenience, and value.

19. Had Plaintiff Barrett known that features integrated into her Vehicle and associated with her ownership experience would later be restricted absent payment of a

recurring subscription fee, Plaintiff Barrett would not have purchased her Vehicle, would have paid less for it, or would have selected a competing alternative.

20. Plaintiff Richard Chapman is a citizen of the State of Texas, and resides in Nueces County, Texas. In January 2023, Plaintiff Chapman purchased a new 2023 Mazda CX-5 from an authorized Mazda dealership in Texas. Plaintiff Chapman's Vehicle included access to Mazda Connected Services through the MyMazda App, including features such as remote start, remote lock and unlock, vehicle finder, and other app-based functionalities that Plaintiff Chapman used and valued as part of owning his Vehicle. Those features formed part of the value of the Vehicle and were material to Plaintiff Chapman's purchasing decision.

21. At the time Plaintiff Chapman purchased his Vehicle, neither Mazda nor the dealership clearly disclosed at or before the point of sale that continued access to those features would later be restricted or subject to future monthly charges after a limited period. Plaintiff Chapman later learned that Mazda had placed some or all Connected Services functionality behind a paid subscription requirement. Following expiration of the complimentary trial period, Plaintiff Chapman did not purchase a subscription. As a result, Plaintiff Chapman lost access to connected features and functionality he reasonably believed were included with his Vehicle as purchased, diminishing the Vehicle's utility, convenience, and value.

22. Had Plaintiff Chapman known that features integrated into his Vehicle and associated with his ownership experience would later be restricted absent payment of a recurring subscription fee, Plaintiff Chapman would not have purchased his Vehicle, would have paid less for it, or would have selected a competing alternative.

**Defendant**

23. Defendant Mazda Motor of America, Inc. d/b/a Mazda North American Operations is a California corporation with its principal place of business located at 200 Spectrum Center Drive, Irvine, California 92618. Mazda North American Operations is engaged in the business of designing, manufacturing, warranting, marketing, advertising,

selling, and leasing vehicles under the "Mazda" brand name, including the Vehicles, through a network of dealerships in the United States, including in California.

## FACTUAL ALLEGATIONS

### ***Mazda Markets Connected Services as a Material Feature of Vehicle Ownership***

24. Mazda develops, manufactures, markets, distributes, warrants, and sells passenger vehicles throughout the United States, including the Vehicles at issue here.

25. In recent years, connected vehicle technology has become an increasingly important factor in consumer vehicle purchasing decisions. Consumers evaluate vehicles based in part on app-based connectivity, remote access, vehicle monitoring, and other software-enabled convenience features. Mazda recognized that demand and incorporated connected functionality into its marketing and sale of Mazda Vehicles.

26. Mazda introduced Mazda Connected Services in the United States with the launch of the 2020 Mazda CX-30.[5] Mazda described Connected Services as a platform that let owners remotely interact with, monitor, and manage their vehicles through the MyMazda App.

27. From the outset, Mazda marketed Connected Services as an integral component of the vehicle ownership experience, emphasizing convenience, safety, and remote access capabilities designed to enhance the utility, desirability, and value of Mazda Vehicles. Its promotional materials emphasized Connected Services features and functionalities, including remote engine start, remote lock and unlock, vehicle finder, vehicle health monitoring, maintenance alerts, notifications, and emergency-related services.[6]

---

[5] *See* Press Release, Mazda N. Am. Operations, *2020 Mazda CX-30: Inspiring the Road Ahead* (Nov. 20, 2019), https://news.mazdausa.com/2019-11-20-2020-Mazda-CX-30-Inspiring-The-Road-Ahead.

[6] *See id.*

28. Mazda then expanded Connected Services across additional models within its lineup. In July 2020, Mazda announced that all 2021 Mazda3 models would be equipped with Mazda Connected Services through the MyMazda App.[7]

29. In August 2020, Mazda similarly announced that the 2021 Mazda CX-5 would include access to Mazda Connected Services.[8]

30. Mazda continued to market Connected Services as part of the ownership experience, promising "the unparalleled convenience of staying connected with the car through technology."

31. Mazda promoted features such as remote start and stop, remote lock and unlock, vehicle finder, vehicle status monitoring, vehicle health reports, alerts, guest driver alerts, and send-to-car navigation through the MyMazda App. To date, Mazda markets Connected Services as standard features included with the purchase or lease of a new Vehicle, available with compatible vehicles equipped with factory-installed telematics systems and accessible through the MyMazda App.[9]

32. Mazda's marketing and advertising materials represent that Vehicle owners may access remote engine start, remote door lock and unlock, vehicle finder, vehicle status information, vehicle health reporting, maintenance notifications, and related convenience features.[10]

---

[7] *See* Press Release, Mazda N. Am. Operations, *2021 Mazda3: Well-Suited with Added Powertrains* (July 8, 2020), https://news.mazdausa.com/2020-07-08-2021-mazda3-well-suited-with-added-powertrains.

[8] *See* Press Release, Mazda N. Am. Operations, *2021 Mazda CX-5: More To Discover* (Aug. 25, 2020), https://news.mazdausa.com/2020-08-25-2021-Mazda-CX-5-More-To-Discover.

[9] *See* Mazda Connected Services Terms & Conditions, Mazda USA, https://www.mazdausa.com/site/terms-of-use-connectedservices (last visited May 26, 2026); Connectivity Privacy Policy, Mazda USA, https://www.mazdausa.com/site/privacy-connectedservices (last visited May 26, 2026).

[10] *See* Mazda Connected Services Features per Vehicle, Mazda USA, https://www.mazdausa.com/siteassets/global-resources/vehicle-resources/mazda-connect/mazda-connected-services-availability-chart.pdf (last visited May 26, 2026); Mazda Connected Services User Guide, Mazda USA, https://www.mazdausa.com/static/manuals/mazda-connected-service/chapter3/section4.html (last visited May 26, 2026).

33. Mazda affirmatively directs owners to download the MyMazda App, activate Connected Services, and use those features as part of ordinary ownership.[11] These capabilities are material product attributes that add utility, convenience, and value to Mazda Vehicles.

***<u>Connected Services Are Material to Consumers and Intended to Be Relied Upon</u>***

34. Connected vehicle functionality materially affects vehicle purchasing decisions because features such as remote start, app-based lock and unlock, vehicle location, maintenance alerts, and status reporting provide concrete daily utility. A reasonable consumer would consider it important not only that those capabilities exist, but also that continued access would not later be conditioned on recurring payments.

35. Industry reporting confirms that automakers recognize the value consumers place on app-based connected features.[12] Mazda therefore knew that Connected Services would influence whether consumers purchased a Mazda, which model or trim they selected, and the price they were willing to pay.

36. The MyMazda App is the gateway to the connected functionality Mazda promoted. After purchase, Mazda directed consumers to download the app, register their Vehicles, activate Connected Services, and use the advertised features to remotely start vehicles, lock and unlock doors, locate vehicles, monitor status, and receive maintenance notifications. Mazda intended that consumers adopt and rely on those functions as part of ordinary ownership, thereby reinforcing the impression that access to Connected Services was part of the purchased Vehicle itself.

37. Mazda's marketing highlighted the existence, convenience, and utility of Connected Services while failing to disclose or omitting that continued access to

---

[11] *See* MyMazda App, Mazda USA, https://www.mazdausa.com/owners/how-to-use-my-mazda (last visited May 26, 2026); Contact Mazda Connected Services, Mazda USA, https://webpage.mazdausa.com/MazdaStatic/CVContactus.action (last visited May 26, 2026).

[12] *See* Stef Schrader, *What Automakers Offer App Subscriptions and How Much They Cost*, Cars.com (Apr. 24, 2025), https://www.cars.com/articles/what-automakers-offer-app-subscriptions-and-how-much-do-they-cost-520637/.

prominently marketed Connected Services features and remote functionalities would require recurring payment after any trial period expired.

38. Mazda possessed exclusive or superior knowledge of the duration, limitations, and paywall governing Connected Services and had a duty to disclose, at or before the point of sale, that continued access to those prominently marketed functions would later require recurring payments. Mazda did not clearly and conspicuously disclose that fact where reasonable consumers would notice it before buying or leasing.

39. Instead, Mazda used those same features to induce purchases and leases, encouraged consumers to activate and rely on them after purchase, and then required Plaintiffs and Class members to pay recurring fees for continued access to Connected Services features and remote functionalities Mazda had already used to help sell the Vehicles. Consumers who did not purchase a paid subscription following the trial period lost access to some or all Connected Services features and remote functionalities.

40. Public reporting likewise noted that Mazda shifted certain remote-start functionality from the key fob to the MyMazda App ecosystem, further tying access to Mazda's subscription platform.[13]

41. Had Plaintiffs and Class members known the truth, they would not have purchased or leased their Vehicles, would have paid less, or would have chosen competing vehicles. Mazda's omissions denied them the benefit of their bargain and diminished the value of their Vehicles.

42. Consumer reaction confirms that reasonable purchasers did not expect that access to Connected Services features and remote functionalities would be placed behind a recurring post-sale paywall.

---

[13] *See* José Rodríguez Jr., *Mazda Quietly Ditched Key Fob Remote Start for Subscription App*, The Drive (Aug. 5, 2024), https://www.thedrive.com/news/mazda-quietly-ditched-key-fob-remote-start-for-subscription-app. Mazda's own materials confirm that continued access depends on subscription status. *See* Mazda Connected Services User Guide, *supra.*

43. Public reporting documented backlash to Mazda's subscription charges for Connected Services features and remote vehicle functionality.[14] The following are some complaints submitted on forums and social media websites by Vehicle owners[15]:

- "I have my window sticker. 2025 CX 50 Meridian Edition. No mention of any app related services."[16]

- "I I let mine lapse and called Mazda to resubscribe. The guy told me the app is useless without the subscription being paid. These cars are so expensive already this is robbery."[17]

- "I'm very satisfied with my CX-50 in every aspect except for one. Who decided to turn a Remote Start into monthly subscription service? I was amazed that such a standard function has turned into a monthly revenue stream for the company. I've had this function on my last 5 cars, as part of an option package with no complaints. What's next installation of a card reader so I can pay for use of the headlights or air conditioning? Living in Michigan I can count the number of times I need the auto start function in the spring, summer and fall, but it sure is nice to warm up the car during those frigid mornings in January but I'll throw on my coat and brave the cold before I pay $10 / month for this 'option'."[18]

- "If this was explained to me at the dealership prior to closing the purchase, I would've walked away pissed off. I just spent $60k on a loaded TS PP and now they want 120/ year to use their app????!! that is such bullshit. We need a class action lawsuit and threaten to never buy Mazda again unless they change this. It's the principle of the issue!"[19]

---

[14] *See* Noah Joseph, *Mazda Customers Furious Over Remote Start Subscription Fees*, CarBuzz, https://carbuzz.com/mazda-remote-start-subscription-backlash/ (last visited May 26, 2026). Owner discussions likewise reflect surprise at Mazda's subscription practices. *See, e.g.*, User Review Thread, CX50Forums.com, https://www.cx50forums.com/threads/10k-miles-and-5-months-with-my-cx50-mini-review-my-thoughts-so-far.2834/ (last visited May 26, 2026).

[15] The following complaints are reproduced as they appear online. Any topographical errors are attributable to the original author.

[16] https://www.cx50forums.com/posts/20483/.

[17] https://www.cx50forums.com/posts/20268/.

[18] https://www.cx50forums.com/posts/20252/.

[19] https://www.cx90forum.com/threads/mazda-connect-renewal.2396/.

- "Anyone been able to sweet talk Mazda into getting this service free? My one year trial expires this month and the app does not justify $10/mo. This is the first brand that I've owned where the remote start hasn't been included in the fob and or a free app."[20]

- "Can someone please justify the price of $10/month to me for remote start and door locks? I was surprised today to find out that the Mazda Connect was a subscription service after having my car new off the lot for 2 years. what really blew my mind was that it apparently a $10/month service to mearly unlock/lock my doors, and start my car - something that I might do once or twice a day. this is definitely not a data intensive service by any means."[21]

- "**When did the MyMazda app become a paid subscription?** I thought the app was just down. But now we have to pay for something to work sometimes. This was a feature sold to me when I bought my car 'you can turn it on from your phone'."[22]

- "You pay 30-60K for a car. Remote start should least be on the key fob and the app where the app has further range and capability but you still have the option to start your car when it's snowing outside"[23]

## CLASS ACTION ALLEGATIONS

44. Plaintiffs bring this action individually, and on behalf of all members of the following Classes (together, the "Class" or "Classes") of similarly situated persons:

> **Nationwide Class**
> All citizens of the United States who purchased or leased a Vehicle equipped with Mazda Connected Services (the "Nationwide Class").
>
> **New Jersey Subclass**
> All citizens of the state of New Jersey who purchased or leased a Vehicle equipped with Mazda Connected Services (the "New Jersey Subclass").

---

[20] https://www.reddit.com/r/MazdaCX30/comments/1rrddco/mazda_connected_service/.
[21] https://www.reddit.com/r/mazda/comments/1rj8cgf/mazda_connect_monthly_subscription/.
[22] https://www.reddit.com/r/mazda/comments/1s1g5i3/when_did_the_mymazda_app_become_a_paid/
[23] https://www.reddit.com/r/mazda/comments/1egs0ik/connected_services_no_longer_free/

**<u>Texas Subclass</u>**
All citizens of the state of Texas who purchased or leased a Vehicle equipped with Mazda Connected Services (the "Texas Subclass").

45. The above-defined classes are referred to collectively as the "Class." Excluded from the Class are Defendant, its affiliates, officers and directors, persons or entities that purchased the Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the class definitions if discovery and/or further investigation reveal that they should be expanded or otherwise modified.

46. **<u>Numerosity</u>**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of impacted Vehicles have been sold and leased nationwide.

47. **<u>Existence/Predominance of Common Questions of Fact and Law</u>**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

- whether Defendant engaged in the conduct alleged herein;
- whether Defendant's conduct violates the consumer-protection statutes and other laws asserted herein;
- whether Plaintiffs and Class Members overpaid for their Vehicles;
- whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of losing access to Connected Services features and functionality;
- whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Defendant's conduct

alleged herein, and if so, the amount or proper measure of those damages; and

- whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

48. **<u>Typicality</u>**: Plaintiffs' claims are typical of those of other Class members because Plaintiffs' use and enjoyment of their Vehicles was disrupted, like that of every other Class member, as a result of Mazda's imposition of paid subscriptions. *Inter alia*, all Class members were injured through Mazda's common course of misconduct. Plaintiffs advance the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses unique to Plaintiffs. Plaintiffs' claims and those of Class members arise from the same operative facts and are based on the same legal theories.

49. **<u>Adequacy</u>**: Plaintiffs are adequate class representatives for the Class because their interests do not conflict with the interests of the Class that they seek to represent. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation—including consumer fraud class action cases—and counsel intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their experienced counsel.

50. **<u>Superiority</u>**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them by Defendant. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the

class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based upon, inter alia, the records (including databases, e-mails, dealership records and files, etc.) Defendant maintains regarding its sales and leases of the Vehicles.

51. Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, et seq.
### (On behalf of Plaintiffs and the Nationwide Class)

52. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

53. The Unfair Competition Law ("UCL") prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising. In the course of conducting business, Defendant committed unlawful business practices by, among other things, making the misrepresentations and omissions of material fact set forth herein and violating California Civil Code sections 1572, 1573, 1709, and 1711, and Business and Professions Code sections 17200 et seq. and 17500 et seq.

54. In the course of conducting business, Defendant committed unfair business practices by, among other things, misrepresenting and omitting material facts regarding the availability, limitation, duration, and subscription-based nature of Connected Services. There is no societal benefit from such false and misleading representations and omissions, only harm. While Plaintiffs and other Class members were harmed by this conduct, Defendant was unjustly enriched. As a result, Defendant's conduct is unfair because it offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

55. The UCL also prohibits any “fraudulent business act or practice.” In the course of conducting business, Defendant committed “fraudulent business act[s] or practices” by, among other things, prominently making representations and omitting material facts regarding the availability, limitation, duration, and cost of Connected Services.

56. Defendant’s actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading, and likely to deceive the consuming public within the meaning of the UCL.

57. Plaintiffs were deceived as a result of their reliance on Defendant’s material representations and omissions, which are described above. Plaintiffs suffered injury in fact and lost money as a result by paying more for their Vehicles than they otherwise would have paid, paying subscription fees for continued access to Connected Services features and connected functionalities, and losing the benefit of their bargain and the value of Connected Services features and connected functionalities marketed as part of the ownership experience.

58. Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

59. Plaintiffs, on behalf of themselves and all others similarly situated, seek restitution from Defendant of all monies obtained from Plaintiffs and the other Class members as a result of unfair competition, an injunction prohibiting Defendant from continuing such practices, and all other relief this Court deems appropriate, consistent with Business and Professions Code section 17203.

## COUNT II
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. ANN. §§ 56:8-1, et seq.
## (On behalf of Plaintiff Barrett and the New Jersey Subclass)

60. Plaintiff Barrett realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

61. Plaintiff Barrett brings this claim on behalf of herself and the New Jersey Subclass.

62. Mazda is a "person," as defined by N.J. Stat. Ann. § 56:8-1(d). Mazda sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e). The New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq*., prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

63. Mazda's representations and omissions were material because they were likely to deceive reasonable consumers.

64. Mazda intended to mislead Plaintiff Barrett and New Jersey Subclass members and induce them to rely on its misrepresentations and omissions.

65. Mazda acted intentionally, knowingly, or recklessly in concealing material information regarding the duration, limitations, and paid-subscription nature of Connected Services.

66. As a direct and proximate result of Mazda's unconscionable and deceptive practices, Plaintiff Barrett and New Jersey Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary damages, including by paying more for their Vehicles than they otherwise would have paid, paying subscription fees for continued access to Connected Services features and connected functionalities, and losing the benefit of their bargain.

67. Plaintiff Barrett and New Jersey Subclass members suffered damages as a result of Mazda's actions. Plaintiff Barrett seeks all relief available under N.J. Stat. Ann. §§ 56:8-1 et seq., including actual damages, treble damages where available, attorneys' fees and costs, and such other relief as the Court deems necessary or proper.

**COUNT III**

**VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT, TEX. BUS. & COM. CODE §§ 17.41, ET SEQ.**

**(On behalf of Plaintiff Chapman and the Texas Subclass)**

68. Plaintiff Chapman realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

69. Plaintiff Chapman brings this claim on behalf of himself and the Texas Subclass.

70. Mazda is a "person," as defined by Tex. Bus. & Com. Code § 17.45(3).

71. Plaintiff Chapman and the Texas Subclass members are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

72. Mazda advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

73. Mazda engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

a. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

b. Representing that goods or services are of a particular standard, quality or grade, if they are of another; and

c. Advertising goods or services with intent not to sell them as advertised.

74. Mazda intended to mislead Plaintiff Chapman and Texas Subclass members and induce them to rely on its misrepresentations and omissions.

75. Mazda's representations and omissions were material because they were likely to deceive reasonable consumers.

76. Had Mazda disclosed to Plaintiff Chapman and Texas Subclass members, at or before the point of sale, that continued access to Connected Services features and connected functionalities would be conditioned on payment of recurring subscription fees after a limited complimentary period, Plaintiff Chapman and Texas Subclass members would not have purchased their Vehicles, would have paid less for them, or would have chosen a competing vehicle. Plaintiff Chapman and Texas Subclass members acted reasonably in relying on Mazda's representations and omissions because the truth concerning continued access to Connected Services features and connected functionalities was known to Mazda and not adequately disclosed to consumers.

77. Mazda had a duty to disclose the above facts due to the circumstances of this case. Mazda's duty to disclose arose from its:

a. Possession of exclusive knowledge regarding the availability, duration, limitation, and paywall governing Connected Services;
b. Active concealment of material facts concerning the availability, duration, limitation, and paywall governing Connected Services; and
c. Incomplete representations about the true nature of Connected Services, including their availability, duration, limitation, and cost.

78. Mazda engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Mazda engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

79. Consumers, including Plaintiff Chapman and Texas Subclass members, lacked knowledge about the above business practices, omissions, and misrepresentations because this information was known exclusively by Mazda.

80. Mazda intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Mazda's conduct is glaringly noticeable, flagrant, complete, and unmitigated.

81. Mazda acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiff Chapman's and Texas Subclass members' rights. Mazda knowingly or recklessly misrepresented and omitted material facts concerning the Vehicles and the availability, duration, limitation, and paid nature of Connected Services.

82. As a direct and proximate result of Mazda's unconscionable and deceptive acts or practices, Plaintiff Chapman and Texas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Vehicles, paying more than they otherwise would have paid, paying subscription fees for continued access to Connected Services, and losing access to Connected Services features and connected functionalities marketed as part of the ownership experience. Mazda's unconscionable and deceptive acts or practices were a producing cause of Plaintiff Chapman's and Texas Subclass members' injuries, ascertainable losses, economic damages, and non-economic damages.

83. Mazda's violations present a continuing risk to Plaintiff Chapman and Texas Subclass members as well as to the general public.

84. Plaintiff Chapman sent a letter complying with Tex. Bus. & Com. Code § 17.505(a) to Defendant contemporaneous with the filing of this complaint.

85. Plaintiff Chapman does not currently seek damages under this claim. If Mazda does not respond to Plaintiffs' notice and fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 60 days of the date of Plaintiff Chapman's notice pursuant to Tex. Bus. & Com. Code § 17.505(a), Plaintiff will seek actual, punitive, and statutory damages, costs, expenses, and attorneys' fees.

**COUNT IV**

**COMMON LAW FRAUD AND FRAUDULENT CONCEALMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

86. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth at length herein.

87. Defendant made material omissions concerning presently existing or past facts. For example, Defendant knew about but did not fully and truthfully disclose to consumers the true nature of the Connected Services features included with Plaintiffs' and Class members' Vehicles.

88. The facts concealed or not disclosed by Defendant to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Defendant's Vehicles or pay a lesser price.

89. Defendant had a duty to disclose the true nature, duration, limitations, and paid-subscription costs of Connected Services at or before the point of sale because those facts were known and/or accessible only to Defendant; Defendant had superior knowledge and access to those facts; and Defendant knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class members. Defendant also had a duty to disclose because they made affirmative representations about the convenience, utility, and availability of Connected Services, which were misleading, deceptive, and incomplete without disclosure of the additional facts set forth above concerning the limitations and subscription-based costs governing continued access.

90. Had Plaintiffs and the Class known the true nature, duration, limitations, and future cost of Connected Services, they would not have purchased or leased the Vehicles or would have paid less for them.

91. As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Vehicles and suffered the resulting economic harm described herein.

92. These omissions were made by Defendant with knowledge of their falsity, and with the intent that Plaintiffs and Class Members rely upon them.

93. Plaintiffs and Class Members reasonably relied on these omissions and suffered damages as a result. To the extent that Defendant's conduct was willful, oppressive, or malicious, Plaintiffs and Class Members are entitled to an award of punitive damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

94. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth at length herein.

95. This claim is pleaded in the alternative to the other claims set forth herein.

96. As the intended and expected result of its conscious wrongdoing, Defendant have profited and benefited from the purchase and lease of Vehicles equipped with Mazda Connected Services, and from subscription fees paid for continued access to Connected Services.

97. Defendant have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendant's misconduct alleged herein, Plaintiffs and the Class did not receive the value represented by Defendant and reasonably expected. Specifically, Plaintiffs and the Class expected that when they purchased or leased Vehicles equipped with Connected Services, continued access to prominently marketed Connected Services features and connected functionalities would not later be placed behind a recurring post-sale paywall.

98. Defendant have been unjustly enriched by their fraudulent, deceptive, unlawful, and unfair conduct, and withholding of benefits and unearned monies from Plaintiffs and the Class, at the expense of these parties.

99. Equity and good conscience militate against permitting Defendant to retain these profits and benefits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that the Court enter judgment against Defendant and award the following relief:

A. Certification of the proposed Class(es), appointment of Plaintiffs and their counsel to represent the proposed Class, and notice to the proposed Class to be paid by Defendant;

B. Temporary and permanent injunctive relief prohibiting Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C. Appropriate declaratory, equitable, and restitutionary relief, including an order requiring adequate disclosure of the duration, limitations, and paid-subscription requirements governing Connected Services;

D. Restitution, actual damages, statutory damages where available, punitive or exemplary damages where available, disgorgement where available, and all other monetary relief permitted by law in an amount to be determined at trial;

E. Pre-judgment and post-judgment interest as allowed by law;

F. Reasonable attorneys' fees and costs where authorized by law; and

G. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED: May 27, 2026 Respectfully submitted,

*/s/ Tina Wolfson*

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500

Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

Bradley K. King (SBN 274399)
bking@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: 917.336.0171
Facsimile: 917.336.0177

*Attorneys for Plaintiffs and the Proposed Class*